In the Matter of WEST BRANCH CONSERVATION ASSOCIATION, INC., et al., Appellants, v PLANNING BOARD OF THE TOWN OF CLARKSTOWN, Respondent. [616 NYS2d 550] —In a proceeding pursuant to CPLR article 78, to review a determination of the Planning Board of the Town of Clarkstown in the form of a negative declaration pursuant to the State Environmental Quality Review Act (ECL 8-0101 *et seq.*) and preliminary approval for a subdivision application, the petitioners appeal from a judgment of the Supreme Court, Rockland County (Scarpino, J.), entered July 2, 1992, which dismissed the proceeding.

Ordered that the judgment is reversed, on the law, with costs, the petition is granted, the determination is annulled, and the matter is remitted to the Planning Board of the Town of Clarkstown for the preparation of an Environmental Impact Statement and such further proceedings consistent with the State Environmental Quality Review Act as it deems appropriate.

The property that is the subject of this proceeding is a 52.85-acre tract of land located on the slopes of High Tor Mountain in Rockland County. A portion of the site had been

previously used as a vineyard and winery. The property is largely wooded, contains steep slopes, is utilized by various forms of wildlife and is near the Palisades Interstate Park. The current owner sought approval to transform the site into a residential development with an access road. Among other things, the proposal entailed the removal of some twenty-one acres of vegetation from the site and the construction of twenty houses.

In performing its environmental review of the project pursuant to the State Environmental Quality Review Act (hereinafter SEQRA), the Planning Board of the Town of Clarkstown (hereinafter the Planning Board) reviewed an Environmental Assessment Form identifying several areas of potentially significant environmental impacts. However, the Planning Board apparently assumed that since several of these impacts could ultimately be mitigated through careful planning, the subdivision would not have a significant effect on the environment. Therefore it issued a negative declaration and ended the SEQRA process without requiring the preparation of an Environmental Impact Statement (hereinafter EIS).

We find that the Planning Board's determination is irrational, and violates both the letter and spirit of SEQRA, and that it must therefore be annulled *(see, e.g., Matter of Group For The S. Fork v Wines,* 190 AD2d 794; *Matter of Holmes v Brookhaven Town Planning Bd.,* 137 AD2d 601; *Inland Vale Farm Co. v Stergianopoulos,* 104 AD2d 395, *affd* 65 NY2d 718).

The primary purpose of SEQRA is " 'to inject environmental considerations directly into governmental decision making' " *(Akpan v Koch,* 75 NY2d 561, 569, quoting *Matter of Coca-Cola Bottling Co. v Board of Estimate,* 72 NY2d 674, 679). It "insures that agency decision-makers—enlightened by public comment where appropriate—will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices" *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 414-415).

The heart of SEQRA is the Environmental Impact Statement process. SEQRA mandates the preparation of an EIS when a proposed development project "may have a significant effect on the environment" (ECL 8-0109 [2]). It is well settled that because the operative word triggering the requirement of an EIS is "may", there is a "relatively low threshold for

impact statements" *(Matter of Farrington Close Condominium, Bd. of Mgrs. v Incorporated Vil. of Southampton,* 205 AD2d 623; *see also, Matter of Group For The S. Fork v Wines, supra; Matter of Holmes v Brookhaven Town Planning Bd., supra; Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 364-365).

Agencies are directed to make an initial determination as early as possible as to whether an EIS needs to be prepared *(see,* ECL 8-0109 [4]). "[T]o require an EIS for a proposed action, the lead agency must determine that the action may include the potential for *at least one* significant environmental effect" (6 NYCRR 617.6 [g] [1] [i] [emphasis supplied]). Such a finding is deemed a "positive declaration" (6 NYCRR 617.2 [cc]). "[T]o determine that an EIS will not be required for an action, the lead agency must determine either that there *will be no environmental effect* or that the identified environmental effects *will not be significant*" (6 NYCRR 617.6 [g] [1] [ii] [emphasis supplied]). Such a finding is deemed a "negative declaration" (6 NYCRR 617.2 [y]).

In making determinations of significance, the reviewing agencies must compare impacts which may be reasonably expected to result from the proposed action against an illustrative list of criteria contained at 6 NYCRR 617.11. This list contains "indicators of significant effects on the environment" (6 NYCRR 617.11 [a]). It includes actions which result in "a substantial increase in potential for erosion, flooding, leaching or drainage problems" (6 NYCRR 617.11 [a] [1]), "the removal or destruction of large quantities of vegetation or fauna", or the "substantial interference with the movement of any resident or migratory fish or wildlife species" (6 NYCRR 617.11 [a] [2]), and "a substantial change in the use, or intensity of use, of land including agricultural, open space or recreational resources" (6 NYCRR 617.11 [a] [8]).

At the outset of the SEQRA review for the proposed subdivision, the Town's Department of Environmental Control determined that the project might result in a significant impact upon the environment, and it therefore directed the developer to prepare a Full Environmental Assessment Form (hereinafter EAF). An EAF is used as a guide by a lead agency in making a determination of whether to issue a negative or positive declaration. The Full EAF was prepared and indicated that of the 52.85 acres comprising the parcel, 21 acres of vegetation would be removed, there would be a potential large physical change to the property, there would be construction on slopes of 15% or greater, and construction would continue

for more than one year. The EAF further indicated that the proposed action would alter and substantially increase the flow of surface water runoff and would create the potential for substantial erosion. Additionally, the project would potentially affect aesthetic resources and would cause a slight increase in residential traffic.

Thereafter, the developer of the property submitted an Environmental Report to the Planning Board ostensibly to assist the Board in making its determination of whether to issue a negative or positive declaration. This report was not an EIS nor was it deemed to be such by the Planning Board. Indeed, if it were to be deemed an EIS then a prerequisite "positive declaration" would have to have been issued. None had been.

The report essentially discussed various methods by which the environmental impacts of the project could be mitigated. We note that the report contained the types of discussions of mitigation techniques that one would find in an EIS. However, the report could not legitimately serve as a substitute for an EIS and the attendant analysis and public discussion entailed in a proper SEQRA review.

An EIS sets forth a description of the proposed action, including its environmental impact and any unavoidable adverse environmental effects (ECL 8-0109 [2] [a]-[c]; 6 NYCRR 617.14 [f] [1]-[4]); alternatives to the proposed action (ECL 8-0109 [2] [d]); and mitigation measures to minimize the environmental impact (ECL 8-0109 [2] [f]; 6 NYCRR 617.14 [f] [7]). SEQRA requires agencies to "act and choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects" (ECL 8-0109 [1]). Once an EIS has been prepared, the Planning Board then studies the EIS, hears public commentary, and works with the developer and the community to determine which method would most successfully "mitigate" each environmental impact in question. It then decides whether or not to grant the developer's application for subdivision approval. This process was absent here.

In issuing its negative declaration the Planning Board listed some 13 reasons supporting its determination. As to potential impacts on the ecology, it noted that "the development will generally be kept out of the forest and off the slopes, and every effort will be made to retain as much of the natural features as is possible". In discussing mitigation techniques

and manners in which to protect the environment, the Planning Board inherently acknowledged that the project may cause significant environmental impacts. Furthermore, significantly missing from the Planning Board's determination was any discussion of the impact of removing some 21 acres of vegetation from the site, despite the fact that the removal or destruction of large quantities of vegetation or fauna is an indicator of a significant effect on the environment *(see,* 6 NYCRR 617.11).

The Planning Board further acknowledged that a variety of wildlife lived and foraged in the subject area. It suggested that although the subdivision would cause interference with wildlife habitats, the wildlife would be able to seek refuge elsewhere and could "make cautious use of open-space mixed in with the residential areas". Inherent in the Planning Board's determination was a finding that the subdivision might cause "substantial interference with the movement of any resident or migratory fish or wildlife species"—another indicator of a significant effect on the environment (6 NYCRR 617.11 [a] [2]).

Additionally, the Planning Board found that surface runoff would be "controlled and drained positively to prevent erosion, thereby protecting the pond water quality from the potential impacts associated with subdivision runoff", and "[e]rosion will be prevented by minimizing cut and fill and road or access drive grades". Again, inherent in the Planning Board's discussion of these issues was an underlying acknowledgement that there existed a potential for a substantial increase in potential for erosion—yet another indicator of a significant effect on the environment *(see,* 6 NYCRR 617.11 [a] [1]).

Finally, significantly absent from the Planning Board's negative declaration was any discussion of the change and intensification of use which the residential subdivision would cause to the property *(see,* 6 NYCRR 617.11 [a] [8]). In light of all these factors, it is obvious that the construction of the subdivision and access road might have had an adverse effect upon many areas of environmental concern. Thus, the Planning Board should have issued a positive declaration and required the preparation of an EIS. The Planning Board's negative declaration was arbitrary and capricious and unsupported by the record. Accordingly, the matter must be remitted to the respondent so that an EIS may be prepared *(see, Matter of Holmes v Brookhaven Town Planning Bd.,* 137 AD2d 601, *supra).*

In light of our determination, we need not address the

petitioners' remaining contentions regarding the impropriety of the negative declaration.

We further find that the Supreme Court properly determined that while the petitioner West Branch Conservation Association, Inc. lacked the requisite standing to bring this proceeding the petitioner Marcus Ratliff did have standing (see, e.g., Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 774; Matter of Mobil Oil Corp. v Syracuse Indus. Dev. Agency, 76 NY2d 428; Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, 413).

The petitioners' remaining contentions are without merit. Rosenblatt, J. P., Copertino, Joy and Florio, JJ., concur.