OPINION OF THE COURT
Barbara Howe, J.
This is a combined CPLR article 78 proceeding and declaratory judgment action, in which petitioners "challenge (a) respondent Town Board’s [alleged] failure to comply with the letter and spirit of the State Environmental Quality Review Act (SEQRA) prior to adopting a March 4, 1996 resolution extending for three years the Town of Amherst’s program to kill an unspecified number of deer in various sections of that township through implementation of a so-called 'bait-and-shoot’ program, and (b) the procedures used by said Town Board to suspend enforcement of that town’s ordinance prohibiting the discharge of firearms for such bait-and-shoot program.” Petitioners request the following relief, all of which is opposed by respondents:
"Rescinding and nullifying the March 4, 1996 resolution which approved the three-year bait-and-shoot program and suspended enforcement of the town’s ordinance against the discharge of firearms.
"Rescinding and nullifying the Negative Declaration, dated March 4, 1996.
"Ordering respondent Town Board to issue a Positive Declaration and prepare a draft Environmental Impact Statement, and to otherwise comply fully with the requirements of SEQRA before reaching any determination whether to implement a bait-and-shoot program, or any other deer management program, in the Town of Amherst.
"Declaring respondent Town Board’s resolution suspending enforcement of the Town’s prohibition against the discharge of firearms invalid.”
BACKGROUND
On February 27, 1995, the Amherst Town Board adopted a resolution which enacted a bait-and-shoot program "for the purpose of reducing deer herds” in the Town "in order to avoid damage to property and the risk of personal injury.” Prior to *970 the approval of that resolution, the Town "had caused an Environmental Assessment Form to be prepared from which it appears that such a program will have positive rather than negative environmental effects, in that reduction of the herd will result in fewer deer/vehicle collisions and less damage to crops, plantings and other vegetation”. The Town Board expressly found as follows in enacting the February 27, 1995 resolution:
"The Environmental Assessment Form prepared by the Planning Department is approved. The bait and shoot program is determined to be an Unlisted action. The bait and shoot program will be conducted only if an appropriate permit is issued by New York State Department of Environmental Conservation. The program will have no significant adverse environmental impacts and will produce positive effects, reducing property damage and the risk of personal injury. A negative declaration shall be executed by the Town Supervisor and filed in accordance with 6 NYCRR 617 * * *
"The bait and shoot program shall be executed by the Amherst Police Department in consultation with New York State Department of Environmental Conservation and shall commence only when a permit is issued by DEC. Assignment of personnel for the program shall be made by the Chief of Police. Enforcement of the ordinance prohibiting the discharge of firearms is suspended for this program.”
Following the adoption of this 1995 resolution by the Town, the Department of Environmental Conservation (hereafter DEC) issued a permit to the Town "to conduct a so-called 'bait- and-shoot’ deer control program on Town owned property through the use of Police Department personnel” (affidavit of John B. Askey, Amherst Chief of Police, sworn to Apr. 12, 1996, at 5). On June 12, 1995, DEC wrote to Thomas J. Ahern, (then) Amherst Town Supervisor, that "the results of this year’s deer control measures are encouraging. The cooperation of the Amherst police was excellent and helped make this year’s control program a success” (id., exhibit C).
On February 5, 1996, DEC wrote to (then) Supervisor Ahern as follows:
"Please find enclosed a copy of a map with the latest data from our aerial deer surveys for the Town of Amherst. The survey on January 11, 1996 documented a total of 648 deer, which compares with a total of 1116 deer on February 28, 1994 (42 percent decrease). The enclosed map shows the number of deer observed in the town during both surveys.
*971 "It would appear that the combined nuisance deer damage permits and the 1995 Bait-and-Shoot have helped to reduce the deer population in the northern portion of the town. In that part of the town where deer have been killed on the two types of permits (area designated on enclosed map) the number of deer observed dropped from 628 deer in 1994 to 277 deer in 1996 (decrease of 56 percent). In the rest of the town, the number of deer observed was 488 in 1994 and 371 in 1996 (decrease of 24 percent). The decrease of the number of deer in the area where no kill permits have been issued may be a result of one or more of the following reasons:
"1. The 1994 survey was more accurate than the 1996 survey.
"2. The decrease in the number of deer observed may have been a result of the high number of deer/car collisions that have occurred in the last two years.
"3. The severe winter of 1993-94 may have resulted in enough winter mortality to deer to have contributed to fewer deer observed on our flight in 1996” (affidavit of Joseph J. Gillings, Planning Director of Town of Amherst, sworn to Aug. 5, 1996, exhibit K [emphasis added]).
A Short Environmental Assessment Form (SEAF) for the proposed 1996-1998 bait-and-shoot-program was prepared by the Town on February 26, 1996 (part I) and on March 4, 1996 (part II). A Full Environmental Assessment Form (FEAF) for the 1996-1998 program was prepared by the Town on March 4, 1996. The SEAF determined that "the proposed action will not result in any significant adverse environmental impacts” (SEAF, at 2), and the FEAF determined that "[t]he project will not result in any large and important impact(s) and, therefore, is one which will not have a significant impact on the environment, therefore a negative declaration will be prepared” (FEAF, at 1).
The Amherst Town Board approved, by a 6-1 vote, a resolution at its March 4, 1996 meeting authorizing the bait-and-shoot program for 1996, 1997 and 1998, as follows:
"The Environmental Assessment Form prepared by the Planning Department is approved. The extension of the bait and shoot program is determined to be an Unlisted action. The bait and shoot program in 1996-1998 will be conducted only if an appropriate permit is issued by DEC. The program will have no significant adverse environmental impacts and will produce positive effects, reducing property damage and the risk of personal injury. A negative declaration shall be executed by *972 the Town Supervisor and filed in accordance with 6 NYCRR 617.
"The bait and shoot program shall be executed by the Amherst Police Department in consultation with New York State Department of Environmental Conservation and shall commence only when a permit is issued by DEC. Assignment of personnel for the program shall be made by the Chief of Police. Enforcement of the ordinance prohibiting the discharge of firearms is suspended for this program.”
The March 4, 1996 negative declaration which the Town Board directed to be filed provides as follows:
"The Lead Agency [Town of Amherst Town Board] has determined that the proposed action described below will not have a significant adverse effect on the environment.
"Title of Action: Extension of Bait and Shoot Program
"SEQR Status: Unlisted Action
"Description of Action: Proposed harvest of a predetermined number of deer from north areas of the town by a bait and shoot method.
"Location: Undeveloped areas as shown on map
"Petitioner: Town of Amherst

"Reasons Supporting This Determination

"The planned action is a three year, seasonal program (1996, 1997, 1998) to reduce deer herd population for the purpose of avoiding property damage and personal injury resulting from deer/vehicle collision and destruction of crops and other growing materials by the deer. This action is a continuation or extension of the 1995 Bait and Shoot Program in the Town of Amherst.
"A preliminary staff analysis was undertaken and an Environmental Assessment Form prepared. The action was considered in light of the criteria contained in 6 NYCRR 617.11 and the information contained in the EAF as well as the review preceding the 1995 program and evaluation of its results. Compared against those criteria and the other information in the EAF there will be no significant effect on the environment.
"Based on information recorded by the New York State Department of Environmental Conservation and the Amherst Police Department, the 1995 Bait & Shoot Program undertaken by the Town was successful in reducing deer/vehicle collisions, provided NYSDEC with useful information on deer behavior and supplied 10,000 pounds of venison to the Food Bank of Western New York.
*973 "There will be no adverse impacts on land, water, air, plants or animals (except as allowed by NYSDEC), agricultural land resources, aesthetic resources, historic and archaeological resources, open space and recreation, transportation, energy, noise and odor, public health and growth and character of community. Both long and short term impacts will be positive rather than negative” (emphasis added).
DEC issued the Town a "deer damage permit for shooting deer on Town property” on March 5, 1996. That permit authorized the killing of 200 antlerless deer by "law enforcement officials of the Amherst Police Department” from March 5, 1996 through April 30, 1996 (cf., affidavit of John B. Askey, op. cit., exhibit E).
While this litigation has been pending, although not because of the litigation, the Town has voluntarily suspended its bait- and-shoot program.
THE SEQRA REVIEW
It is undisputed that the focus of the Town’s actions is the reduction of the deer herd size in the Town. Petitioners contend, inter alia, that the SEQRA process, which resulted in the March 4, 1996 negative declaration, was fatally defective because at no time did the Town have before it any data which could have led it to conclude that such action would not result in a significant adverse environmental impact (cf., 6 NYCRR 617.7). Specifically, petitioners argue that because the Town had no idea how many deer DEC would authorize to be killed under the bait-and-shoot program, there was no basis for the Town to conclude that the deer reduction program would not have a significant adverse effect on the environment.[1]
The Town responds to petitioners’ argument as follows. First, the Town contends that the 1996 resolution was nothing more than an extension of the 1995 bait-and-shoot program, and that, as such, any challenge to the SEQRA process is time barred. I find this position unpersuasive. The record demonstrates conclusively that both DEC and the Town agreed in February 1996 that a new SEQRA review was necessary before the 1996-1998 bait-and-shoot program could be authorized. Thus, although data available from the 1995 program could *974 properly be used by the Town in the 1996 SEQRA review process, as it apparently was, it is clear that the proposed 1996-1998 program had to be, and was, considered de novo.
Second, the Town contends that there is no requirement in law to "preset with specificity” the level of deer herd reduction to be accomplished by the bait-and-shoot program. As set forth in respondent’s memorandum of law'(at 11), the Town points out that the March 5, 1996 permit issued by DEC "placed limits on the number of deer that could be taken during the [March 5, 1996 to April 30, 1996] period”, thus indicating that "it was not the intent of the NYSDEC or the Town to totally eliminate the entire deer population in the Town”. The difficulty with the Town’s position in this regard, of course, is that DEC set the number of deer that could be killed under the 1996 bait- and-shoot program after the Town had completed its SEQRA review, after the Town had issued its negative declaration, and after the Town had passed the resolution which was dependent upon the SEQRA review findings and determinations.
As pointed out in the SEQRA Handbook (at 45 [1992 ed]), a negative declaration "must be based on the facts available to the lead agency at the time of the determination. Issuing a Negative Declaration and then requiring the project sponsor to conduct studies to determine the magnitude of an impact is improper. The lead agency must have sufficient information to show that the impact will not be significant at the time it makes its negative declaration.”
Here, the March 4, 1996 SEAF states, in part II (C) (3), that the bait-and-shoot program could result in adversely affecting "fauna * * * or wildlife species” in the Town, specifically, a "predetermined number of deer harvested by bait & shoot methodology” (emphasis added). The March 4, 1996 FEAF echoes this finding, and details at part 1 (B) (7) (a) that the program is to be carried out in three phases, in the "early spring/late winter of 1996, 1997 & 1998”. Part 2 of the FEAF, dealing with "Project Impacts and Their Magnitude”, indicates that the "[p]roposed [a]ction [will] substantially affect non-threatened or non-endangered species” (emphasis added), but the FEAF fails to state to what extent the program would interfere with any "resident or migratory * * * wildlife spe *975 cíes”, notwithstanding that the FEAF requests such information.[2]
Indeed, without knowing how many deer were to be killed under the 1996-1998 program, I perceive of no way that the Town could have measured the potential impact on the deer population. That, however, was precisely what the SEQRA review process required the Town to do.
In Matter of West Branch Conservation Assn. v Planning Bd. (207 AD2d 837, 838-839) the Appellate Division, Second Department, in reviewing a negative declaration issued by respondent, made the following observations:
"The primary purpose of SEQRA is ' "to inject environmental considerations directly into governmental decision making” ’ (Akpan v Koch, 75 NY2d 561, 569, quoting Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 679). It insures that agency decision-makers — enlightened by public comment where appropriate — will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices’ (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-415).
"The heart of SEQRA is the Environmental Impact Statement process. SEQRA mandates the preparation of an EIS when a proposed development project 'may have a significant effect on the environment’ (ECL 8-0109 [2]). It is well settled that because the operative word triggering the requirement of an EIS is 'may’, there is a 'relatively low threshold for impact statements’ (Matter of Farrington Close Condominium, Bd. of Mgrs. v Incorporated Vil. of Southampton, 205 AD2d 623; see also, Matter of Group For The S. Fork v Wines [190 AD2d 794]; Matter of Holmes v Brookhaven Town Planning Bd. [137 AD2d 601]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364-365).
"Agencies are directed to make an initial determination as early as possible as to whether an EIS needs to be prepared *976 (see, ECL 8-0109 [4]). '[T]o require an EIS for a proposed action, the lead agency must determine that the action may include the potential for at least one significant environmental effect’ (6 NYCRR 617.6 [g] [1] [i] [emphasis supplied]). Such a finding is deemed a 'positive declaration’ (6 NYCRR 617.2 [cc]). '[T]o determine that an EIS will not be required for an action, the lead agency must determine either that there will be no environmental effect or that the identified environmental effects will not be significant’ (6 NYCRR 617.6 [g] [1] [ii] [emphasis supplied]). Such a finding is deemed a 'negative declaration’ (6 NYCRR 617.2 [y]).
”In making determinations of significance, the reviewing agencies must compare impacts which may be reasonably expected to result from the proposed action against an illustrative list of criteria contained at 6 NYCRR 617.11. This list contains 'indicators of significant effects on the environment’ (6 NYCRR 617.11 [a]). It includes actions which result in 'a substantial increase in potential for erosion, flooding, leaching or drainage problems’ (6 NYCRR 617.11 [a] [1]), ’the removal or destruction of large quantities of vegetation or fauna’, or the 'substantial interference with the movement of any resident or migratory fish or wildlife species’ (6 NYCRR 617.11 [a] [2]), and 'a substantial change in the use, or intensity of use, of land including agricultural, open space or recreational resources’ (6 NYCRR 617.11 [a] [8])” (emphasis added; cf. also, Matter of Miller v City of Lockport, 210 AD2d 955).[3]
Given the 1996 FEAF’s finding that the wildlife species involved would be "substantially affected” by the bait-and-shoot program, a negative declaration should not have been issued in the absence of a supportable finding that the deer would not be significantly affected by the program. Without knowing how many deer were to be killed under the program, there was no way for the Town to make such a finding, because, without such actual numbers, there is no way to know whether "large quantities” of deer would be destroyed or not (cf., 6 NYCRR 617.7 [c] [1] [ii]).
In point of fact, the Town implicitly acknowledged its inability to render a proper negative declaration when it stated in its March 4, 1996 resolution that its 1996-1998 bait-and-shoot program "will be conducted only if an appropriate permit is issued by DEC”. The Town’s March 4, 1996 negative declara *977 tion itself makes this clear: "There will be no adverse impacts on * * * animals (except as allowed by NYSDEQ” (emphasis added). These determinations, in essence, left to the DEC the determination of how many deer should be killed, and, therefore, the ultimate decision of whether the impact of the program on such wildlife species would be significant or not. This was improper (cf., Matter of Golten Mar. Co. v New York State Dept. of Envtl. Conservation, 193 AD2d 742).
Furthermore, I cannot see how the Town could make the negative declaration that it did, which here necessarily includes a finding that the 1997 and 1998 phases of the program will have no significant effect on the environment, in a factual vacuum about the future size of the deer population in the Town at such times. It is no answer to the Town’s difficulty in making such a SEQRA evaluation to say, as the Town (in effect) does, that its program will impact the environment only to the extent allowed by DEC.[4]
The Town’s 1996 resolution appears to me to have approved the concept of a bait-and-shoot program in order to deal with what it has found to be a problem with the size of the deer herd population in the Town. Such a choice is clearly the prerogative of the Town, and if the dispute before this court were only as to the wisdom of such a choice, the Town’s determination would clearly have to be upheld: "The often stated rule regarding [a court’s] role in reviewing SEQRA determinations needs no extended discussion; it is not to weigh the desirability of any proposed action or to choose among alternatives and procedural requirements of SEQRA and the regulations implementing it (Matter of Village of Westbury v Department of Transp., 75 NY2d 62, 66), but to determine whether the agency took a 'hard look’ at the proposed project and made a 'reasoned elaboration’ of the basis for its determination (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, supra). Where an agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evi *978 dence, the agency’s determination may be annulled (see, CPLR 7803 [3]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363; Matter of Jackson v New York State Urban Dev. Corp., supra; see generally, 55 NY Jur 2d, Environmental Rights, § 65).” (Matter of WEOK Broadcasting Corp. v Planning Bd., 79 NY2d 373, 383; cf. also, Matter of Neville v Koch, 79 NY2d 416, 424-425).
I find that the Town’s 1996 determination in issuing a negative declaration was irrational and violated both the letter and spirit of SEQRA, and it must, therefore, be annulled. That being so, the balance of the Town’s resolution — which approved the bait-and-shoot program for 1996, 1997 and 1998 — must also be annulled.
Although the Town has vigorously urged that DEC controls the permit process, and, therefore, determines how many deer can be killed during any given permit period, it is possible that the Town can involve DEC during its SEQRA review process and obtain an early determination from DEC as to how many deer can be killed under a permit for a given period. It is, however, for the Town to decide how it will meet its SEQRA responsibilities consistent with the requirements of law, and all this court can do at this point is to determine that, in 1996, the Town failed to do so.
In light of my determination that the SEQRA requirements were violated and that the bait-and-shoot program authorized in 1996 must be annulled, it is unnecessary to reach the subsidiary issue raised by petitioners as to whether the suspension of the Town’s firearms ordinance was valid.
Accordingly, and for the reasons stated, the Town’s March 4, 1996 resolution approving a bait-and-shoot program for 1996, 1997 and 1998, and the negative declaration issued by the Town, shall be, and they hereby are annulled, vacated and set aside in all respects. To the extent petitioners seek a declaratory judgment in this regard, the same is hereby granted as follows:
1. The Town shall commence the SEQRA process entirely de novo as to any bait-and-shoot program it desires to implement in the Town from the date hereof (cf., Matter of Ferrari v Town of Penfield Planning Bd., 181 AD2d 149);
2. The issue of whether the Town validly suspended its firearms ordinance for the bait-and-shoot program has been rendered academic and moot by virtue of the nullification of the 1996 resolution with respect to implementing a bait-and- *979 shoot program in the Town in 1996, 1997 and 1998, and to rule on the merits of that issue, under such circumstances, would, in effect, constitute an advisory opinion only.[5]

. Petitioners also argue that the Town is required to determine what an "acceptable” deer population in the Town is in order to decide whether some or all of the deer herd should be reduced. Although I do not believe SEQRA as such requires such a determination, it is unnecessary to reach such issue in light of my ultimate determinations here.

. The 1995 FEAF indicated that the proposed 1995 bait-and-shoot program would have only a small to moderate impact on the affected wildlife species. That 1995 finding is clearly beyond the review of this court, but, because a new FEAF was prepared for the 1996-1998 program, the 1995 findings are obviously not conclusive about the impact of the proposed 1996-1998 program on the affected wildlife species, namely, the deer. This is especially so because the number of deer in the Town and the number to be killed under the program would undoubtedly vary from one year to the next.

. The regulation citations in West Branch (supra) refer to the 1987 regulations; these regulations were revised and somewhat renumbered effective January 1, 1996.

. DEC itself appears to recognize, the tenuousness of a negative declaration about the future environmental impacts of the program. On February 28, 1996 DEC wrote to the Town Attorney that it concurred in the Town’s lead agency status "for the duration of the Town’s bait and shoot program, unless conditions change significantly in future years and continuance of the bait and shoot program may become questionable” (affirmation of John P. Lane, dated Apr. 15, 1996, exhibit G [emphasis added]).

. During this litigation, and in response to the Town’s early dismissal motion, I directed that DEC be joined as a necessary party. When the merits of this case were argued before me on January 8, 1997, DEC moved to be dismissed from the case. In light of my disposition of this case on the merits, it is unnecessary to decide DEC’S motion.