▪ In the Matter of UPROSE et al., Appellants, v POWER AUTHORITY OF STATE OF NEW YORK, Sued Herein as NEW YORK POWER AUTHORITY, et al., Respondents. [729 NYS2d 42] —In a proceeding pursuant to CPLR article 78, *inter alia,* to review

determinations of (a) the New York State Board on Electric Generation Siting and the Environment, dated November 16, 2000, exempting the respondent Power Authority of the State of New York, s/h/a New York Power Authority from complying with the certification process required by Public Service Law article X and (b) the Power Authority of the State of New York, s/h/a New York Power Authority, dated November 20, 2000, which issued a negative declaration under the State Environmental Quality Review Act (ECL art 8) regarding the siting, construction, and operation of 11 natural gas-powered turbine electric generator units, the appeal is from stated portions of (1) a judgment of the Supreme Court, Kings County (Knipel, J.), entered April 9, 2001, which denied the petition and dismissed the proceeding, and (2) an amended judgment of the same court, entered April 20, 2001, which awarded the same relief.

Ordered that the appeal from the judgment is dismissed, without costs or disbursements, as the judgment was superseded by the amended judgment; and it is further,

Ordered that the amended judgment is modified, on the law, by deleting the provision thereof denying those branches of the petition which were to annul the negative declaration issued by the Power Authority of the State of New York, and substituting therefor provisions (1) granting the petition to the extent of annulling the negative declaration issued by the Power Authority of State of New York, (2) directing the Power Authority of the State of New York to issue a positive declaration, (3) remitting the matter to the Power Authority of the State of New York to prepare a full Environmental Impact Statement, and (4) enjoining the Power Authority of the State of New York from further construction or operation of the subject generating facilities; as so modified, the amended judgment is affirmed insofar as appealed from, without costs or disbursements; and it is further,

Ordered that so much of the amended judgment as enjoined the Power Authority of the State of New York from further construction or operation of the subject generating facilities is stayed until January 31, 2002, to afford the Power Authority of the State of New York an opportunity to expeditiously comply with the requirements of the State Environmental Quality Review Act, without prejudice to an application in the Supreme Court, Kings County, for a further extension, if necessary; if no extension is requested or if an application for an extension is denied, upon application of the petitioners the Supreme Court, Kings County, shall vacate this stay.

In August 2000 the Power Authority of the State of New York, s/h/a New York Power Authority (hereinafter NYPA) authorized the purchase of 11 "LM-6000" simple cycle gas-powered turbine generators for use at various sites (hereinafter the Project). After reviewing various locations, NYPA determined that the turbines were to be sited as follows: two turbines at a single site in Sunset Park, Brooklyn (23rd Street and Third Avenue); one turbine in Williamsburg, Brooklyn (North 1st Street); two turbines at a single site in Long Island City, Queens (Vernon Boulevard); two turbines at one site in the South Bronx (Hell Gate); two turbines at another site in the South Bronx (Harlem River Yards); one turbine at a site in Brentwood, Long Island (Pilgrim State); and one turbine at a site in Staten Island (Pouch Terminal) (*see, Matter of Silvercup Studios v Power Auth.*, 285 AD2d 598 [decided herewith]).

Each of the turbines has a net generating capacity of 44 megawatts (hereinafter MW). Pursuant to Public Service Law § 160 (2), if a facility generates more than 80 MW it is characterized as a "major electric generating facility" subject to the requirements of Public Service Law article X.

After designating itself the lead agency pursuant to the State Environmental Quality Review Act (hereinafter SEQRA) (*see,* ECL art 8), NYPA, among other things, sought a ruling from the New York State Board on Electric Generation Siting and the Environment (hereinafter the Siting Board) that because NYPA would ensure that any two generator units on a common site would produce less than 80 MW of electricity, the site would not constitute a "major electric generating facility" thereby exempting it from the requirements of Public Service Law article X. After receiving public comments on the issue, the Siting Board ruled that if NYPA "makes a legally binding commitment * * * that the units will not be operated at a total net generating capacity of 80 MW or more * * * the generating facility so constructed and so operated will not be a major electric generating facility subject to * * * article X of the Public Service Law."

Subsequently, NYPA prepared an Environmental Assessment Form (hereinafter EAF) for the Project. The EAF covered six of the seven facilities. A supplemental EAF was prepared for the Staten Island facility and is not at issue here. The EAF concluded that the Project would not have any potential significant environmental impacts, and NYPA, as lead agency, issued a negative declaration for the Project (*see,* 6 NYCRR 617.7).

The petitioners commenced this proceeding pursuant to

CPLR article 78 to challenge, among other things, the ruling of the Siting Board and the negative declaration issued by NYPA. The Supreme Court denied the petition in its entirety and dismissed the proceeding. On appeal, the petitioners limit their claims to two issues: (1) that the Supreme Court erred in holding that the Siting Board properly interpreted Public Service Law § 160 (2), thereby exempting the project from compliance with the review procedures of Public Service Law article X, and (2) that the Supreme Court erred in confirming the negative declaration issued by NYPA in light of the EAF's failure to adequately address the environmental impact of particulate matter which will allegedly be generated as a result of the Project's operation.

The Supreme Court properly concluded that the Siting Board did not act outside the scope of its legitimate power in interpreting Public Service Law § 160 (2). In reviewing a determination of a regulatory commission courts must "[engage] in 'a realistic appraisal of the particular situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment' " (*Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.*, 69 NY2d 365, 371-372, quoting *Matter of Consolidated Edison Co. v Public Serv. Commn.*, 47 NY2d 94, 102; *see also, Matter of New York Tel. Co. v Public Serv. Commn.*, 271 AD2d 35, 39). Here, although Public Service Law § 160 (2) does not specify whether a design standard or an operational standard should be used to interpret the term "generating capacity," the Siting Board's use of an operational standard was realistic and reasonable, particularly in light of a prior ruling by the Public Service Commission (*see,* order of Public Service Commission denying petition for rehearing, *Salt City Energy Venture* [May 27, 1988]). Moreover, the Legislature's specific use of the term "design capacity" in other sections of the Public Service Law supports the Siting Board's interpretation (*see,* Public Service Law § 120 [2]).

However, we find that the analysis by NYPA on the environmental impact of particulate matter was inadequate, and therefore, the Supreme Court erred in failing to annul the negative declaration. Pursuant to Clean Air Act § 108 (42 USC § 7408), "air quality criteria" for air pollutants are to be issued from time to time (*see,* Clean Air Act § 108 [a] [1]; 42 USC § 7408 [a] [1]). Once "air quality criteria" for a particular pollutant are issued, the Administrator of the United States Environmental Protection Agency (hereinafter the Administrator) is required to promulgate national primary ambient air

quality standards (hereinafter NAAQS) for such pollutants (*see,* Clean Air Act § 109 [a]; 42 USC § 7409 [a]). Thereafter, the standards must be reviewed every five years and the Administrator "shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate" (Clean Air Act § 109 [d] [1]; 42 USC § 7409 [d] [1]).

Particulate matter is the " 'generic term for a broad class of chemically and physically diverse substances that exist as discrete particles (liquid droplets or solids) over a wide range of sizes' " (Interim Decision, Commissioner, NYS Dept of Envtl Conservation, *Matter of American Mar. Rail* [Feb. 14, 2001], quoting Wooley, Clean Air Handbook, at 1-14, n 15 [9th ed]). Prior to 1997, standards for particulate matter were maintained for particulate matter of 10 microns in diameter (hereinafter PM 10). In 1997, the Administrator revised the NAAQS for particulate matter and added a new standard for PM 2.5 emissions (*see,* 40 CFR 50.7). Although the revised NAAQS were the subject of a legal challenge (*see, American Trucking Assn. v United States Envtl. Protection Agency,* 175 F3d 1027, *affd in part, revd in part sub nom. Whitman v American Trucking Assn.,* 531 US 457), NYPA nevertheless analyzed PM 2.5 emissions by assuming that all PM 10 emissions were PM 2.5 emissions and concluded that the individual and cumulative impacts of such emissions by the purposed facilities would be insignificant.

Particulate matter is a nonthreshold pollutant, which means that there is some possibility of an adverse health impact from particulate matter at any concentration (*see, American Trucking v EPA: Unjustified Revival of the Nondelegation Doctrine,* 23-SPG Environs Envtl L & Policy J 17, 26). The health effects associated with PM 2.5 emissions include: premature mortality and increased hospital admissions and emergency room visits, primarily in the elderly and individuals with cardiopulmonary disease; increased respiratory symptoms and disease in children and individuals with cardiopulmonary disease such as asthma; decreased lung function, particularly in children and individuals with asthma; and alterations in lung tissue structure and in respiratory tract defense mechanisms (*see,* 62 Fed Reg 38652).

Judicial review of the SEQRA process is limited to whether the determination of the lead agency was made in violation of lawful procedure, was affected by error of law, or was arbitrary and capricious or an abuse of discretion (*see, Akpan v Koch,* 75 NY2d 561, 570; *Matter of City of Rye v Korff,* 249 AD2d 470, 471). Courts may review the record to determine if the agency

identified the relevant areas of environmental concern, took a "hard look" at them and made a "reasoned evaluation" of the basis for its determination (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417; *see also, Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 363-364).

SEQRA mandates the preparation of an EIS when the proposed project may include the potential for at least one significant environmental effect (*see, Matter of Omni Partners v County of Nassau*, 237 AD2d 440, 442; *Matter of West Branch Conservation Assn. v Planning Bd.*, 207 AD2d 837, 839). "Because the operative word triggering the requirement of an EIS is 'may', there is a relatively low threshold for the preparation of an EIS" (*Matter of Omni Partners v County of Nassau, supra*, at 442; *see also, Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 397; *Matter of Kahn v Pasnik*, 231 AD2d 568, 569, *affd* 90 NY2d 569). Moreover, SEQRA regulations themselves provide that a Type I action, such as the proposed action here, carries the presumption that it is likely to have a significant adverse impact on the environment and may require an EIS (*see*, 6 NYCRR 617.4 [a] [1]).

In light of the undisputed potential adverse health effects that can result from PM 2.5 emissions, we conclude that NYPA failed to take the requisite "hard look" at this area of environmental concern. An EIS is required if the proposed project "*may include* the potential for at least one significant adverse environmental impact" (6 NYCRR 617.7 [a] [1] [emphasis supplied]). The analysis undertaken by NYPA, in which it assumed that all PM 10 emissions are PM 2.5 emissions is not sufficiently detailed in the EAF and is not an adequate substitute for addressing the health impacts of PM 2.5 emissions. Thus, NYPA should have issued a positive declaration and prepared an EIS (*see, Matter of Syrop v City Council*, 282 AD2d 466; *Matter of Omni Partners v County of Nassau, supra*, at 443; *Matter of West Branch Conservation Assn. v Planning Bd., supra*, 207 AD2d at 841; *Matter of Holmes v Brookhaven Town Planning Bd.*, 137 AD2d 601). Accordingly, the matter is remitted to NYPA so that an EIS may be prepared (*see, Matter of West Branch Conservation Assn. v Planning Bd., supra*, at 841; *Matter of Holmes v Brookhaven Town Planning Bd., supra*). Since construction on the project is almost complete the injunction granted herein is stayed until January 31, 2002, to afford NYPA an opportunity to comply with SEQRA (*see, Matter of Silvercup Studios v Power Auth.*, 285 AD2d 598 [decided herewith]). Altman, J. P., Florio, Schmidt and Cozier, JJ., concur.