Matter of Stop Polluting Orleans County v Crotty (2004 NY Slip Op 50568(U))

[*1]

Matter of Stop Polluting Orleans County v Crotty

2004 NY Slip Op 50568(U)

Decided on May 17, 2004

Supreme Court, Albany County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 17, 2004

Supreme Court, Albany County
In the Matter of STOP POLLUTING ORLEANS COUNTY, INC., and CITIZENS ENVIRONMENTAL COALITION, INC., Petitioners,
against
ERIN M. CROTTY, COMMISSIONER NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION and WASTE MANAGEMENT OF NEW YORK, LLC., Respondents.
3498-03

Bond, Schoeneck & King, PLLC
Attorneys for Petitioners
(Gary A. Abraham, Esq., of Counsel)
One Lincoln Center
Syracuse, New York 13202
Hon. Eliot Spitzer
Attorney General of New York State
Attorney for State Respondent
(John Sipos and Joseph Koczaja, Esqs.,
of Counsel)
The Capitol
Albany, New York 12224
Bond, Schoeneck & King, PLLC.
Attorneys for Respondent WMNY
(Kevin M. Bernstein and Kathleen
M. Bennett, Esqs., of counsel)
One Lincoln Center
Syracuse, New York 13202

Bernard J. Malone, J.
The cause of action in the petition seeking to annul the Interim Decision of then Commissioner of the New York State Department of Environmental Conservation (DEC) John Cahill of May 15, 2000, which adopted all of the recommendations of the DEC Administrative Law Judge (ALJ) except the ALJ's recommendation that correspondent Waste Management of New York (WMNY) be the subject of a hearing upon its fitness to hold the permit it is seeking to operate a solid waste landfill at 3511 Densmore Road in the Town of Albion, New York is dismissed. The petition is granted to the extent of annulling the determination of Commissioner Erin M. Crotty dated February 10, 2003 which granted the permit to operate the landfill while changing the condition of the permit that required onsite monitors employed by DEC, and funded by WMNY, to monitor the construction and operation of the landfill and changed that condition to require that WMNY hire independent monitors employed directly by WMNY, with the approval of DEC, to monitor the construction and operation of the landfill, and the matter is remanded to DEC to either reinstate the public monitor condition of the permit or: give the public notice of this change in policy, i.e. private versus public monitors at large landfills; give the public and affected permittees, or potential permittees, the opportunity to comment upon the proposed policy change before it is implemented or rejected; and to develop a sufficient administrative record for intelligent court review upon the reasonableness of the proposed policy change.
This is an article 78 proceeding brought by two membership corporations organized under New York State's Nor-for-Profit Corporation Law with stated purposes of protecting the environment by insisting on the strict application of the safeguards built into the State Environmental Quality Review Act (SEQRA) and related statutes, regulations and guidelines. The site at issue in this litigation has been operated for waste disposal for more than 40 years. The Village of Albion operated a waste disposal site in the northwest portion of the current proposed landfill site during the 1950's. The McKenna Landfill operated a landfill upon an adjacent parcel of property from 1968 to 1983. The Orleans Sanitary Landfill (OSL) operated a private landfill from 1981 to 1991. OSL operated its facility in violation of the applicable law and entered into a consent order with DEC during 1987. During 1991, OSL sought Bankruptcy Court protection and a Trustee was appointed to wind up the affairs of OSL.
The Trustee entered into a lease with WMNY whereby WMNY had the right to develop a landfill upon the property for a term of 48 years with the obligation to obtain all necessary permits and to create a revenue stream sufficient to be distributed to the creditors of OSL. The Trustee entered into an agreement with DEC for the closure of the landfill which: called for regrading of the site; the acceptance of 100,000 tons of municipal solid waste; final capping of the regraded landfill; and the installation of a monitoring system. WMNY provided these services to the Trustee, apparently to the satisfaction of DEC, and the OSL Landfill is closed with WMNY providing post-closure monitoring.
During March of 1998, WMNY entered into an agreement with DEC for the development and implementation of a Closure Remedial Program for the McKenna Landfill. On January 10, 2000, DEC approved WMNY's final design for the closure of the McKenna Landfill and that remedial construction plan is now complete.
[*2]
During 1994, WMNY applied to DEC for a permit to operate a landfill at the former OSL site. WMNY proposed to construct the "Towpath Facility" located south of the Erie Canal, east of Densmore Avenue, west of Transit Road and north of the Conrail Tracks. The proposed landfill contains a proposed 77-acre eastward expansion from the former OSL site, with a design capacity of 1,800 tons per day and a life expectancy of 16 years. DEC declared itself the lead agency, determined the proposed landfill was a TYPE I action and issued a positive declaration on May 6, 1994. WMNY prepared a three volume Draft Environmental Impact statement during 1996 and DEC issued a Notice of Complete Application on March 24, 1999. The Notice of Complete Application was published in DEC's Environmental Notice Bulletin (ENB) and the Albion Advertiser on March 31, 1999 and a notice of public hearing, which invited potential interveners to submit petitions for party status at the Issues Conference, was published in both newspapers.
The Issues Conference was held on July 20,21 and 22 of 1999, and on August 17,18,19 and 20 of the same year. On December 31, 1999, the ALJ identified three issues for an adjudicatory hearing as follows: the fitness of WMNY to develop and operate the landfill; noise; and hydro geology. The Towns of Albion and Murray, as well as SPOC [FN1], were granted party status by the ALJ. The ruling was appealed to Commissioner Cahill and on May 15, 2000 he issued his Interim Decision and he affirmed the ALJ upon the noise and hydro geology issues and reversed upon the need for a hearing on the issue of WMNY's fitness to build and operate the landfill. Since the fitness issue was no longer before DEC, Commissioner Cahill rescinded the party status of SPOC. The Interim Decision was specifically conditioned, among other conditions, upon there being independent monitoring of the construction and operation of the landfill by monitors employed by DEC and funded by WMNY. In view of DEC's final ruling upon the permit application, the Interim Decision is now ripe for judicial review.
A preliminary issue will be addressed first. The answer of WMNY asserts that the Coalition lacks standing because it did not raise the fitness issue at the administrative level. Since it is clear that SPOC raised the fitness issue at the administrative level and has standing upon that question in this proceeding this Court is not going to use judicial resources in discussing the standing of the Coalition. Rather, it will follow the lead of the Court of Appeals in the case of the Matter of Roman Catholic Diocese of Albany v New York State Dept. of Health, 66 NY2d 948, and assume, without deciding, that the Coalition has standing and proceed to the merits.
The ALJ found the need for a hearing upon fitness. Commissioner Cahill reversed the ALJ upon the following reasoning:

"The applicant has agreed to the conditions in the draft permit and has an operational history with Staff indicating an ability to perform the duties and obligations contained in the draft permit. The applicant's compliance history as proffered here does not indicate an inability to meet these criteria. In addition, the compliance history of WMI does not rise to the level where the outcome of the permitting decision for WMNY, on this point, would be affected; the offers of [*3]proof do not demonstrate that the Applicant's compliance decisions or daily operations for the proposed project will be substantially influenced by the parent."
The petitioners contend that Commissioner Cahill's failure to follow the recommendation of the ALJ upon the need for a hearing upon the fitness issue is arbitrary, capricious and not supported by substantial evidence. First of all, Commissioner Cahill's Interim Decision did not result from a quasi-judicial hearing mandated by law and, thus, the arbitrary and capricious standard of review applies, rather than the substantial evidence standard (Matter of Regional Action Group for the Environment, Inc. v Zagata, 245 AD2d 798). If the determination of an agency has a reasonable basis, it is not arbitrary or capricious (Matter of Gabler v New York State Liq. Auth., 43 AD2d 803). The courts will give great deference to the ruling of an agency within its field of expertise so long as a rational basis for the ruling is articulated within the administrative record (Matter of City of Rensselaer v Duncan, 266 AD2d 657). Here, Commissioner Cahill clearly articulated a rational basis for rejecting the ALJ's recommendation upon the fitness issue. The Commissioner favored local experience with WMNY over alleged wrongdoing by its parent corporation in other states. He found that local management of WMNY was of sufficient independence as to overcome any claim of control by WMI and that any prior noncompliance by WMNY was de minimus. The New York State Legislature has chosen to place such choices with DEC, not the court system and absent illegality or irrational conduct, neither of which is present here, the determinations of the Commissioner of DEC will be upheld.
The next issue is whether the decision of Commissioner Crotty to change the condition of the permit from monitors employed by DEC and funded by WMNY to monitors paid directly by WMNY upon DEC's approval is such a change in policy as to warrant annulment thereof and remand for the development of an appropriate record. In the case of Matter of Coalition for Future of Stoney Brook Village v Reilly, 299 AD2d 481,483, the Appellate Division set forth the purpose of SEQRA as follows:

 "The primary purpose of the State Environmental Quality Review Act (ECL art 8) (hereinafter SEQRA) is to 'inject environmental considerations directly into governmental decision making' (Akpan v Koch, 75 N.Y.2d 561, 569, quoting Matter of Coca- Cola Bottling Co. v Board of Estimate, 72 N.Y.2d 674, 679d 1261; see ECL 8-0109[2]; Matter of Omni Partners v County of Nassau, 237 AD2d 440, 442; Matter of West Branch Conservation Assn. v. Planning Bd. of Town of Clarkstown, 207 AD2d 837, 838). It 'insures that agency decision-makersenlightened by public comment where appropriatewill identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices' (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-415; see Matter of West Branch Conservation Assn. v Planning Bd. of Town of Clarkstown, supra). Literal compliance with the letter and spirit of SEQRA is required, and substantial [*4]compliance with SEQRA is not sufficient to discharge an agency's responsibility under the act (see Matter of Golten Mar. Co. v New York State Dept. of Envtl. Conservation, 193 AD2d 742, 743- 744; Matter of Rye Town/King Civic Assn. v Town of Rye, 82 AD2d 474, 480-481).
'Judicial review of the SEQRA process is limited to whether the determination of the lead agency was made in violation of lawful procedure, was affected by error of law, or was arbitrary and capricious or an abuse of discretion' (Matter of UPROSE v Power Auth. of State of N.Y., 285 AD2d 603, 607; see Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373, 383). Courts 'may review the record to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination'(Matter of Jackson v New York State Urban Dev. Corp., supra at 417, quoting Aldrich v Pattison, 107 AD2d 258, 265; see Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363-364; Matter of UPROSE v Power Auth. of State of N.Y., supra at 607-608). However, a court may not substitute its judgment for that of the agency; it is not the role of the courts to 'weigh the desirability of any action or [to] choose among alternatives' (Matter of Jackson v New York State Urban Dev. Corp., supra at 416)."
In other words, the involved agency is to take a "hard look" before permitting a project that could affect the environment to go forward. The public, if appropriate, is to be given notice of the proposal and the chance to intervene. An administrative record is to be developed to permit intelligent court review. Court review is limited and the determinations of the involved agency are to be upheld unless illegal, irrational or lacking substantial evidence (if a quasi-judicial hearing is mandated by law).
Turning to the legal rules applicable to the change in monitor policy, the law is that a decision of an agency which neither adheres to its own precedents nor indicates a sufficient reason for reaching a different result on essentially the same facts is arbitrary and capricious (see, Matter of Field Delivery Service, 66 NY2d 516). An agency's reason for reaching a different result on similar facts must be reasonably based upon evidence in the record (G.J. & S. Pizza v McLaughlin, 78 AD2d 653). Despite Commissioner Crotty's position that the change from public monitors to private monitors is a "minor, non-substantive revision", the record does not support that assertion. In the ten years prior to the issuance of the final permit challenged here, all approvals of DEC of large landfills, such as the one involved here, were conditioned upon the presence of onsite monitors employed by DEC and funded by the applicant. The e-mails and other correspondence exchanged by top DEC management after Commissioner Crotty changed the policy from public to private monitors establishes that the new policy was a sea change from the previous policy.
DEC states that the change is justified because the sums collected from applicants for monitors never meet the actual expenses incurred by DEC in administering the monitor program. This contention is advanced for the first time in a conclusory fashion in an affidavit offered in [*5]opposition to the petition filed in the Article 78 proceeding. DEC also argues that there is no indication that private monitors are not as effective as public monitors and that DEC will exercise tight oversight of the private monitors. The problem is that DEC never gave the public notice of the proposed policy change [FN2] and the opportunity to comment at a hearing upon it. Therefore, there is no administrative record upon the issue of private versus public monitors to permit this court to determine if the policy change is legal.
All papers, including this decision and order, are being returned to the attorneys for the petitioners. The signing of this decision and order shall not constitute entry or filing under CPLR 2220. Counsel is not relieved from the applicable provisions of that section relating to filing, entry and notice of entry.
 This memorandum shall constitute both the decision and the order of the Court. 
IT IS SO ORDERED.
DATED: ALBANY, NEW YORK
 April , 2004
 BERNARD J. MALONE, JR., J.S.C.
PAPERS CONSIDERED:
Verified petition dated June 5, 2003;

Affidavit by Paul J. D'Amato, Esq., sworn to November 9, 2003, with exhibit;
Brief in support by Gary A. Abraham, Esq., dated December 22, 2003, with exhibits;
Verified answer by Joseph Koczaja, Esq., dated January 9, 2004, with administrative record;
Verified answer dated January 14, 2004;

Answering affidavit by Michael P. Naughton, Esq., sworn to January 13, 2004;
[*6]
Answering affidavit by Henry L. Hamilton, sworn to January 13, 2004;
Footnotes

Footnote 1:SPOC was given party status upon the fitness issue. The petitioner Citizens Environmental Coalition, Inc. (Coalition) never sought party status upon the fitness issue. 

Footnote 2:The Court credits the Commissioner's claim that the private monitor system will not be employed in every case, without regard to other factors, and , therefore the policy change need not be published as a rule and filed with the Secretary of State (Matter of Guptill Holding Corp. v Williams, 140 AD2d 12). However, an administrative agency must follow its own rules and DEC policy is (see, page five of Exhibit 2 of the affidavit of Henry L. Hamilton sworn to January 13, 2004) that "Commissioner Policies must be published in the ENB as indicated below, unless the policy concerns only the internal management of the agency and does not have any affect on the rights of, or the procedures or practices available to, the public." Obviously, the change from public to private monitors, with the perception of monitor loyalty being to the entity paying his or her salary, could affect the rights of the public to a safe environment.