[693 NYS2d 1]

IRA PERKINS, Respondent, v KENNETH NORWICK et al., Appellants.

First Department, May 25, 1999

### APPEARANCES OF COUNSEL

*Jay D. Fischer* of counsel (*James E. Burden* on the brief; *Fischer Weisinger Caliguire Porter & Pierce,* attorneys), for respondent.

*Kenneth P. Norwick* of counsel (*Norwick & Schad,* attorneys), for appellants.

### OPINION OF THE COURT

NARDELLI, J. P.,

Plaintiff Perkins was a 50% owner of Princeton Information

Ltd., a computer software company. Another 50% of Princeton was owned by one Noel Marcus. Marcus and plaintiff had a shareholders agreement dated August 24, 1988, pursuant to which each owned 10 shares and pursuant to which neither could sell, transfer, pledge, assign or otherwise dispose of any portion of the shares except by sale to the corporation or the other shareholder. The agreement provided that in the event the shareholder desired to dispose of the shares, he must offer all of the shares to the corporation at the purchase price set forth in the agreement and the corporation would have the first option to purchase the shares, followed by the remaining shareholder. The agreement also set forth the purchase price as set forth in Schedule A, which was $300,000 a share, or $3 million in toto. The agreement also noted that if the Schedule A was dated more than 18 months prior to the date on which payment for the shares was scheduled to commence, then such purchase price would be "the shareholders share of an amount equal to seven times twelve times the corporation's average pretax monthly income determined for the 24 month period ending at the conclusion of the corporation's most recently completed fiscal quarter." Paragraph 9 of the agreement provided that a shareholder who petitions any court for dissolution of the corporation shall be deemed to have offered his shares for sale under the terms and conditions of the agreement. Finally, paragraph 15 of the agreement stated that all controversies, excluding only controversies regarding a report of the certified public accountant of the corporation who would determine the earnings of the corporation for a purchase price, shall be settled by arbitration.

When plaintiff could not get along with Marcus, he hired defendant law firm, which proposed that a petition be filed to dissolve the corporation and thereafter this was done. The IAS Court, however, referred the matter to arbitration pursuant to the agreement between the shareholders and dismissed the petition to dissolve. The arbitration continued until February 1997, at which time a settlement was achieved between the parties that resulted in Princeton's purchase of plaintiff's stock for a price of $7 million. Plaintiff contended that the actual market value of the stock was in excess of $25 million and commenced an action in legal malpractice against defendants for $18 million. Defendants moved to dismiss plaintiff's complaint based upon the documentary evidence. The Supreme Court denied their motion to dismiss the complaint.

On August 12, 1994, when Perkins filed the petition to dissolve Princeton, he was entitled by the agreement between the

parties at that time to $3 million. Instead of that, in reaching the settlement in 1997, he received $7 million. Thus, no damage was incurred. Perkins, in the motion for dissolution, noted, *inter alia*, that the company was in imminent danger and that the acrimonious relationship between he and Marcus had seriously eroded the viability and value of the corporation and "is certain to destroy the corporation in the near future."

While plaintiff asserts the market value was $25 million, he overlooks the fact that the shareholders agreement flatly prohibited him or Marcus from selling shares to anyone except the other or the corporation *and* the sale had to be at the predetermined price set forth in the agreement. This was $3 million. Even accepting plaintiff's contention that after 18 months the price would go up, plaintiff does not attempt to give any estimate of seven times twelve times average monthly earnings (or 7 years' earnings), which, as noted above, would be the sale price. In any event, no matter what time frame is picked, it appears that plaintiff would not have received anywhere near the amount he asserts the corporation was worth. Plaintiff would have received a multiple of *earnings* of the corporation, not market value. In addition, plaintiff himself valued Marcus's shares at $1,550,000 shortly before the petition to dissolve.

While plaintiff asserts that he *could* have received more than the $7 million he agreed to accept from Marcus, the alternatives and options he comes up with are completely speculative. The only amount he was entitled to receive was, as noted, the $3 million. Accordingly, any damages claimed are entirely speculative also. Thus, plaintiff alleges that Marcus would have voluntarily agreed to increase the agreement's valuation of his and plaintiff's share to more than $7 million. Plaintiff also asserts that Marcus would have agreed to "different terms" that would have required Marcus to pay plaintiff more than $7 million for his shares. Plaintiff's third alternative is that he could have held onto his shares for a while longer and thus obtained more than $7 million. However, plaintiff's own sworn description of the corporation and its imminent and inevitable self-destruction rendered this scenario also highly speculative. Accordingly, since the complaint fails to contain the requisite allegation of "actual ascertainable damages," it fails to state a cause of action.

Our decision in *Sherwood Group v Dornbush, Mensch, Mandelstam & Silverman* (191 AD2d 292) is directly analogous to this case. There, plaintiff, a publicly traded company, which

had an employee stock option plan, asserted a claim of malpractice against defendant attorneys who advised it "to do nothing" (*supra,* at 293) in response to competing claims to shares of stock that were owned by the company's deceased president. The stock thereafter lost value prompting plaintiffs to file an interpleader action in Federal court. After that court ruled that the stock should have promptly been distributed to the widow, the plaintiffs settled with her for $600,000. In their subsequent malpractice action against defendants, plaintiffs alleged that but for the former attorney's advice to "do nothing" they might have tendered the stock to the widow or publicly sold the stock prior to its precipitous decline in value. However, we dismissed the malpractice claim finding that provisions in the governing shareholders agreement rendered plaintiffs' allegations of damages entirely speculative. We noted that by virtue of a "Lockup" agreement pursuant to which the parties could not sell their shares until a future date, plaintiffs did not have the right to sell the stock "owed" to the widow on the market (*supra,* at 294). Therefore, they had the option of tendering stock to the widow or tendering cash on hand. If the stock had been tendered, the widow had the right to demand a cash payment by exercising a "put" granted her, i.e., the right to tender the stock back to the plaintiffs in exchange for the market value at the time. Thus, we found "[i]t is, therefore, entirely speculative to assume that the claim would have been paid in stock, and that even if it had, [the widow] would have kept these essentially non-negotiable securities rather than demanding cash for them at the market price from plaintiffs." (*Sherwood Group v Dornbush, Mensch, Mandelstam & Silverman, supra,* at 294.) We also found gross speculation in the plaintiffs' pleadings that the widow "might" have held on to the stock or that she "might" also have been able to sell the stock privately or that plaintiffs "would have sought" in some undefined manner to "lift the LOCKUP" or reach some other agreement (*supra,* at 294). "All of these contentions are couched in terms of gross speculations on future events and point to the speculative nature of plaintiffs' claim." (*Supra,* at 294.)

Just as in *Sherwood,* plaintiff's complaint does not claim that he in fact sustained any "actual ascertainable damages" resulting from defendants' alleged malpractice since, just as in *Sherwood,* plaintiff had absolutely no right to sell "these essentially non-negotiable securities" to anyone other than Marcus or the corporation at the agreement fixed price of $3 million, which is less than half the amount he ultimately agreed to accept from

Marcus for those shares. Likewise, plaintiff's suggestion that "but for the filing of the petition to dissolve" he "might have" later renegotiated the contractual valuation of his shares or "different terms" with Marcus is simply "gross speculation on future events."

Accordingly, the order of the Supreme Court, New York County (Harold Tompkins, J.), entered December 9, 1997, which denied defendants' motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), should be reversed, on the law, with costs and disbursements, and the motion to dismiss the complaint granted. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint.

TOM, MAZZARELLI and RUBIN, JJ., concur.

Order, Supreme Court, New York County, entered December 9, 1997, reversed, on the law, with costs and disbursements, and the motion to dismiss the complaint granted.