OPINION OF THE COURT
Joseph G. Owen, J.
It is hereby ordered that (i) the motion of petitioners-plaintiffs is granted as to their causes of action based on exclusionary zoning and the State Environmental Quality Review Act (SE-QRA) (Land Master 1st, 3d, 7th, 8th, 17th; Roswind 7th, 9th, 13th, 15th, 22d), and is otherwise denied; and (ii) the cross motion of respondents-defendants is granted to the extent that the remaining causes of action are dismissed, and is otherwise denied; and it is further ordered that the Comprehensive Plan, Local Law No. 4 (2004) and Local Law No. 5 (2004) of the Town of Montgomery are declared null and void; and it is further ordered that pending any further good faith proceedings in compliance with the determination herein, the prior existing Comprehensive Plan and prior applicable zoning laws affecting the subject properties remain in effect and petitioners’ respective applications are reinstated.
In 2001 and 2002, petitioners-plaintiffs (hereinafter petitioners) submitted land use applications for certain projects involving alleged affordable and cluster housing in an area located near the intersection of routes 17K and 208 in the town of Montgomery known as “Scott’s Corners.” Subsequently, after imposing a moratorium prohibiting the approval of residential development plans exceeding three dwelling units, the Town of Montgomery enacted a new Comprehensive Plan, followed by Local Law Nos. 4 and 5, which petitioners claim effectively preclude any realistic opportunity for affordable multiple dwelling or small lot single-family developments. Among other things, petitioners allege unconstitutional exclusionary zoning; violation of the federal Fair Housing Act; violation of equal protection rights; and other such unlawful activities.
Factual Background
*872 The Town of Montgomery’s first Comprehensive Plan was adopted in 1965. Among other things, this initial plan designated the “Scott’s Corners” area of the town of Montgomery as a priority growth area. The following year the Town adopted its first zoning law, effectively making Scott’s Corners the only area in which multi-family housing was permitted through its RM-1 (residential multi-family), RA-2 and RA-3 (residential agricultural) zoning designations. Throughout the ensuing years, and several comprehensive plan revisions, those designations remained the same until the operative events herein.
In 1992 the Town Board established a sewer district, denominated “Sewer District 3,” within the Scott’s Corners area. According to petitioners, in reliance upon this designation the property owners processed a state pollutant discharge elimination system application with the New York State Department of Environmental Conservation for a wastewater treatment plant permit. This measure was, on petitioners’ account, supported by the town supervisor in office at the time.
On or about May 16, 2001, petitioner Roswind Farmland Corp. submitted its application to the Planning Board for the development of a 139-acre mixed use enhancement to the existing public golf course located at Scott’s Corners, including clustered single-family homes and multi-family homes as well as commercial retail facilities. According to respondents, this plan contained no low- or moderate-income housing. After the submission of an engineer report on this project and the issuance of Planning Board comments, it appears that Roswind took no further formal proceedings.
Petitioner Land Master submitted its mixed-use “Crossroads Farm Development” plan, also located in the Scott’s Corners area, on or about April 18, 2002. This development, a combination of two earlier projects, included multiple- and single-family dwellings as well as retail and office facilities, a clubhouse, swimming pool and a wastewater treatment plant. According to Land Master, 10% of the anticipated dwellings constituted affordable housing.
A Comprehensive Plan Special Committee was formed on April 9, 2002, pursuant to Town Law § 272-a, to review the Town’s 1988 plan and prepare a revised one. Respondents maintain that this committee held some 43 public meetings during which it carefully considered every aspect of developing a new comprehensive plan. One major issue, according to respondents, became the increased level of motor vehicle traffic *873 in the Scott’s Corners area, together with advice from the New York State Department of Transportation (DOT) that funding for any roadway revisions would be limited. Respondents reference a June 2003 traffic impact study, prepared by the Orange County Planning Department using a build-out analysis of Town Planner Edwin Carling, purportedly indicating that only a 44% increase in total residents was permissible if further traffic congestion was to be avoided in the Scott’s Corner’s area. Petitioners criticize this study as incomplete and respondents criticize it as unfounded.
On May 2, 2002, the Town Board adopted Local Law No. 3 (2002) of the Town of Montgomery, imposing a moratorium on residential developments in excess of three dwelling units, with certain stated exception and waiver provisions. This moratorium, through the adoption of subsequent successive local laws, lasted until on or about November 4, 2004.[1]
The Comprehensive Plan Special Committee issued its first draft on September 23, 2003. Although this initial plan recommended the rezoning of Scott’s Corners so as to reduce the density requirements to three units per acre, it maintained the RM-1 designation. On December 1, 2003, the draft plan was referred to the Orange County Department of Planning. This initial draft plan was subsequently modified by the Town Board.
In the midst of all this, political campaigns were being held for the election of a town supervisor. Petitioners maintain that the successful candidate, Susan Cockburn, campaigned on a “no-growth” platform. Respondents characterize her campaign as a public mandate to pursue a “balanced land use plan.” Susan Cockburn commenced her tenure as Town Supervisor on January 1, 2004.
The Town Board thereafter designated itself as SEQRA lead agency on February 5, 2004, with respect to environmental review of the draft comprehensive plan, and public hearings were held on February 10, 2004, April 29, 2004, June 24, 2004, July 8, 2004 and July 29, 2004. Throughout the public hearing process the Town Board was presented with numerous documents, opinions and reports on affordable housing and other issues presented by the draft plan, including a review submitted by consultants Matthew D. Rudikoff Associates, Inc. and William Agresta. Petitioners submitted documentation indicating *874 that, given the Town’s median household income of $49,422, a median income family could afford a residence valued at $145,000. According to petitioners, none of the 43 houses then listed for sale were at or below this price, showing a need for the development of affordable housing.
Pursuant to General Municipal Law § 239-m, the Orange County Department of Planning (Planning Department) reviewed the draft comprehensive plan and issued a written report dated July 28, 2004, which approved the plan subject to delineated modifications and conditions. Among other things, the Planning Department criticized the draft plan’s removal of sewer and/or water service “density bonuses” (report, July 28, 2004, at 3, 11 7), as well as the imposition of special use permits which ran “contrary to the primary goal ... to ‘promote the development of affordable housing options’ ” (id. at 4, ¶ 9). The Planning Department advised that “[ajdded administrative and permit procedures can not be seen as promoting or being an[ ] incentive for such housing — as they inevitably add time to permit reviews and costs to housing” (id.). As a general comment, the Planning Department expressed concerns regarding the decline of affordable housing, advising that “the zoning revisions necessary to execute the intent of the Comprehensive Plan may . . . further exacerbate the inadequate supply of affordable housing in the Town” (id. at 5).
On July 29, 2004, following the completion of an expanded full environmental assessment form, the Town Board issued a negative declaration and adopted its revised version of the Comprehensive Plan. A public meeting was subsequently held to address implementation of the Comprehensive Plan through rezoning, including the adoption of Local Law No. 4. Among other things, Local Law No. 4 rezoned RM-1, RA-1 and RA-3 districts into RA-.5 and RA-2 districts, reduced density allowances and excluded certain environmental features from lot area calculations.[2] According to the filing statement, it was “the purpose and intent of this local law to delete each and every reference to the RA-1, RA-3 and RM-1 Zoning Districts from the entire Zoning Law and Zoning Map of the Town of Montgomery” (local law filing statement, Oct. 28, 2004, at 11, § IV, ¶ N).
*875 This time the Orange County Planning Department expressly disapproved of Local Law No. 4 in a written report issued on or about October 19, 2004 stating, in pertinent part:
“These amendments that consolidate the RA-1 (Residential Agricultural), RM-1 (Residential/MultiFamily), and RA-3 Districts into either the RA-.5 and RA-2 Districts would effectively eliminate the possibility of multi-family homes in the Town, including that land in the Scott’s Corners area that is identified in the Orange County Comprehensive Plan as part of a Priority Growth Area. Eliminating multi-family housing will significantly impact the Town’s ability to address affordable housing needs, particularly in an area with close proximity to schools, workplaces and public transit.” (Orange County Planning Department report on Local Law No. 4 at 2.)
Notwithstanding this express disapproval, Local Law No. 4 was adopted on October 28, 2004.
Local Law No. 5 was thereafter adopted on November 18, 2004. In pertinent part, this local law granted approval authority of any new or expanded wastewater treatment facilities to the Town Board, in its sole discretion.
Shortly before enactment of Local Law No. 5, and on or about November 3, 2004, the Town established an Affordable Housing Committee, which thereafter rendered a written report on July 7, 2005 entitled “Projected Needs for Affordable Housing In the Town of Montgomery 2005-2010” (AHC report). Among other things, the committee noted that “[t]he most dramatic and consequential increases of cost are found in the single family, homeownership [sic] market” (AHC report at 4), and “that there have been no building permits issued for multifamily housing in the Town of Montgomery since before 1999” (AHC report at 5). To remedy the current “affordability shortfall,” the committee found “that there will be a need for between 688 and 1,010 [owner-occupied affordable] units for the Town of Montgomery” (AHC report at 9).
The Pleadings
Both petitioners have filed and served extensive second amended verified petition/complaints alleging exclusionary zoning (Land Master 1st, 2d, 3d, 7th; Roswind 7th, 8th, 9th, 13th); failure to comply with SEQRA (Land Master 8th; Roswind 15th); violation of the federal Fair Housing Act *876 (Land Master 4th; Roswind 10th); violations of the due process and equal protection rights of petitioners and others (Land Master 5th, 12th, 13th, 14th; Roswind 3d, 6th, 11th, 17th, 18th, 19th); failure to comply with General Municipal Law § 239-m (Land Master 9th; Roswind 14th); discrimination on familial and ethnic grounds (Roswind 2d, 4th); state preemption of Local Law No. 5 (Land Master 16th; Roswind 21st); exceeding statutory authority (Land Master 6th; Roswind 12th); unlawfulness of the moratorium (Land Master 10th, 11th; Roswind 5th, 16th); improper political and personal motivations (Roswind 1st, 5th); recovery of consultancy fees pursuant to General Municipal Law § 51 (Land Master 15th; Roswind 20th);[3] and recovery of attorneys’ fees pursuant to 42 USC § 1983 (Land Master 17th; Roswind 22d).
Respondents have served and filed answers to these complaints/petitions, and the matter has been fully submitted.
Petitioners’ Motion
By the instant motion, petitioners seek the following relief: (1) declaring that Local Law Nos. 4 and 5 constitute unlawful exclusionary zoning and are therefore null and void; (2) declaring that the Town Board failed to comply with SEQRA prior to the adoption of the Comprehensive Plan and Local Law Nos. 4 and 5; (3) declaring that Local Law No. 5 is preempted by state law; (4) directing the Town respondents to review, process and approve petitioners’ land use applications in accordance with the prior zoning laws; (5) severing all other claims; and (6) awarding attorneys’ fees.
A. Standing
As a threshold issue, respondents raise a number of objections regarding the standing of petitioners. To the extent that the petitions are granted herein, the court believes that petitioners have standing by virtue of their status as property owners subject to the challenged zoning changes (see, Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 687-688 [1996]; Matter of Har Enters. v Town of Brookhaven, 74 NY2d 524, 529-530 [1989]; see, generally, Continental Bldg. Co. v Town of N. Salem, 211 AD2d 88 [1995], appeal dismissed and lv denied 86 NY2d 818 [1995]).
*877 B. Exclusionary Zoning
Petitioners argue that, in enacting Local Law Nos. 4 and 5, respondents failed to comply with the two-pronged test initially set forth in Berenson v Town of New Castle (38 NY2d 102 [1975]), to wit: (1) a zoning ordinance must provide a balanced and well-ordered plan for the community; and (2) it must adequately consider regional needs and requirements (id. at 110; Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 92). In making a determination on this issue, it is well accepted that a zoning ordinance carries with it the presumption of constitutionality, which may only be rebutted by proving beyond a reasonable doubt that the ordinance is not designed to accomplish a legitimate purpose (see, Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville, 51 NY2d 338, 344 [1980], cert denied 450 US 1042 [1981]). Under the Berenson test:
“Generally then, a zoning ordinance enacted for a statutorily permitted purpose will be invalidated only if it is demonstrated that it actually was enacted for an improper purpose or if it was enacted without giving proper regard to local and regional housing needs and has an exclusionary effect. Once an exclusionary effect coupled with a failure to balance the local desires with housing needs has been proved, then the burden of otherwise justifying the ordinance shifts to the defendant” (Kurzius, 51 NY2d at 345 [citation omitted]).
Applying these principles, the court believes that petitioners have made a prima facie showing that the challenged laws were enacted without giving proper regard to local and regional housing needs and that they have an exclusionary effect.
Respondents do not seriously contest the local and regional need for affordable housing, and in fact acknowledge this need in the Comprehensive Plan. Respondents documented this need throughout the Comprehensive Plan and zoning amendment processes by applying an affordability index to the Town’s median household income, indicating that from 2000 to 2002 a median income family could afford a residence costing between $145,000 and $185,000. There was evidence adduced, however, that none of the houses on the market during this time period fell within that range. Moreover, the Town’s own Affordable Housing Committee has found the existence of an “affordability *878 shortfall” within the town, indicating a need for between 688 and 1,010 owner-occupied affordable units.[4]
Given these housing needs, the operative test becomes whether or not the zoning ordinances constitute a balanced and well-ordered plan for the community which adequately considers the acknowledged regional needs and requirements for affordable housing. The court believes that the existing zoning structure fails this test.
It cannot be disputed that the Comprehensive Plan, together with Local Law Nos. 4 and 5, constitute a marked departure from the prior zoning structure. Since 1966 Scott’s Corners had been the primary area, and apparently the only area, which expressly permitted multi-family housing as of right through its RM-1, RA-2 and RA-3 zoning designations. By consolidating these districts into RA-.5 and RA-2 designations, the Town eliminated any specifically dedicated multi-family zoning districts. For this reason the Orange County Planning Department, with its more global view of regional needs, expressed serious concerns about the Comprehensive Plan and expressly disapproved of Local Law No. 4.[5] On its face, this zoning scheme is exclusionary.
Respondents forcibly argue that multi-family housing does not necessarily equal affordable housing. While this may be true, multi-family housing has historically been recognized as a barometer in assessing exclusionary zoning claims (see, Berenson v Town of New Castle, supra; Continental Bldg. Co. v Town *879 of N. Salem, supra). “[MJultifamily housing, given the nature of its construction and function as a whole, is one of the most affordable types of housing” (Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 93). The Town’s own Affordable Housing Committee recognized this correlation by noting “that there have been no building permits issued for multifamily housing in the Town of Montgomery since before 1999” (AHC report at 5). The enactment of zoning laws which so severely impact the availability of multi-family housing certainly shifts the burden of explanation to the Town respondents.
In justifying their determination the Town respondents point to several factors. They first argue, relying primarily on the Orange County traffic study which they also criticize, that some measures were necessary to curtail the high growth rate of Scott’s Corners in order to avoid future traffic congestion. The court does not question that traffic control constitutes a legitimate public purpose. However, nowhere on the record do respondents establish a reasonable relationship between that purpose and the total elimination of dedicated multi-family housing districts (see, McMinn v Town of Oyster Bay, 66 NY2d 544, 549-551 [1985]). Aside from a cursory reference to limited State DOT funding, respondents proffer no evidence of prohibitive costs, inherent geographical limitations or other factors making it unreasonable to consider alternative traffic control methods.
Respondents further maintain that the existing zoning structure allows for a wide array of affordable housing opportunities, including lot clustering by permit; relaxation of subdivision lot requirements by permit where provisions are made for affordable housing; incentive zoning measures; “inter-municipal” agreement programs; and multiple housing opportunities such as motor home courts and planned adult communities. These alternatives either commit multi-family and affordable housing to the total discretion of Town officials or affect very limited segments of the total population. Moreover, despite the Town’s consistent reference to “inter-municipal” cooperation in meeting affordable housing needs, respondents point to no evidence in the record of any specific substantive and binding agreements between municipalities. The current zoning scheme, effectively, creates the illusion of affordable housing availability while limiting its reality to a few chosen sectors and vesting almost total control in the town. “[T]hese factors are intrinsically narrow in scope and do very little to *880 genuinely address the established need for multifamily housing” (Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 94).
The court is not, as respondents would infer, requiring them to focus on affordable housing to the exclusion of other forms of housing. “Constitutional principles are not necessarily offended if one or several uses are not included in a particular area or district of the community as long as adequate provision is made to accommodate the needs of the community and the region generally” (Asian Ams. for Equality v Koch, 72 NY2d 121, 133-134 [1988]). However, in this particular matter respondents have not adequately done their share to accommodate the affordable housing needs of the community either within their own boundaries or the region. In short, petitioners have “demonstrated the exclusionary effect, coupled with the failure to balance local desires with housing needs, while [respondents] have clearly failed to demonstrate that the zoning ordinance provides a sufficient array of multifamily housing opportunities to pass scrutiny in this case” (Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 94).
Petitioners and respondents appear to agree that the Comprehensive Plan and Local Law Nos. 4 and 5 cannot be analyzed in a segmented manner. Accordingly, this ruling regarding exclusionary effect addresses all three components.
C. SEQRA
As a threshold issue respondents argue, on the one hand, that petitioners’ SEQRA allegations regarding the Comprehensive Plan are premature because, until the passage of an actual zoning law “[a]ny environmental harm which might befall the [petitioners] or other residents ... is purely speculative” (Matter of Alamit Props. Co. v Planning Bd. of Town of Harrison, 159 AD2d 703, 704 [1990]). On the other hand, respondents argue that Local Law Nos. 4 and 5 are logical derivatives of the Comprehensive Plan and cannot be viewed in a segmented manner (cf. Matter of Citizens Concerned for Harlem Val. Envt. v Town Bd. of Town of Amenia, 264 AD2d 394 [1999], lv denied 94 NY2d 759 [2000]). The court is somewhat unclear as to respondents’ intent in raising these seemingly inconsistent arguments, but clearly the effects of the Comprehensive Plan, upon which respondents relied in enacting Local Law Nos. 4 and 5, are not “speculative.” Accordingly, the court believes that petitioners’ claims are ripe for review.
In essence, petitioners maintain that the Town Board failed to take the requisite “hard look” at environmental *881 concerns regarding affordable housing, and to make a “reasonable elaboration” of the basis for its determination prior to eliminating the RM-1 multi-family zoning district (see, Akpan v Koch, 75 NY2d 561, 570 [1990], mot to amend denied 76 NY2d 846 [1990]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363-364 [1986]; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]). For the reasons which follow, the court agrees.
Respondents acknowledge that the adoption of the Comprehensive Plan and related zoning laws constituted “Type I” actions under SEQRA, mandating a “hard look” at environmental concerns and “the preparation of an [environmental impact statement (EIS)] when a proposed [action] ‘may include the potential for at least one significant environmental effect’ ” (Matter of S.P.A.C.E. v Hurley, 291 AD2d 563, 564 [2002], lv denied 98 NY2d 615 [2002], quoting Matter of UPROSE v Power Auth. of State of N.Y., 285 AD2d 603, 608 [2001]).[6] In this context, “environmental concerns” include not only impacts upon the physical environment, but also impacts upon population patterns, neighborhood character and the community in general (see, Chinese Staff & Workers Assn. v City of New York, supra, 68 NY2d at 366-367). In supporting their position, respondents point to the extensiveness of the record as an indication that the Town Board took a “hard look” at environmental concerns relating to affordable housing. An extensive record, in and of itself, does not satisfy the requirements of SE-QRA.
There is little question that the Town Board recognized the issue of affordable housing as one of legitimate concern. For instance, the October 28, 2004 negative declaration for Local Law No. 4 recites that “[t]he Town Board also considered the potential effects of this local law on the availability of housing, including the availability of affordable housing” (negative declaration, Oct. 28, 2004, at 7). It then went on to estimate that the zoning changes would reduce potential development by only 67 dwelling units, but without assuming “the availability of water and sewer services as set forth in the plan” (id. at 7). Even the *882 Town’s own planner, Edwin Garling, acknowledged that this analysis would have been “significantly different” in the context of an RM-1 zone if it included the impacts assuming availability of water and sewer services (transcript of examination before trial of Edwin Garling at 86, lines 3-6, 15-17, exhibit T to petitioners’ motion).
After making this incomplete analysis the Town Board opined that
“[w]ith respect to potential impacts on the availability of affordable housing, it is difficult to determine the specific effect of this local law, since market forces including soaring materials and labor costs are outside the control of the town, and in no case is there a guarantee that any cost savings afforded by virtue of any land use policy will be passed on to the homebuyer” (negative declaration, Oct. 28, 2004, at 7).
The impact of unspecified “[rjecent studies” indicating that a shift toward larger residences is “completely out of the control of the local government” was considered, with the Town Board concluding that elements such as clustering, housing opportunities in the surrounding villages, mobile home park areas and planned adult communities provide “for higher density and also more affordable housing stock within the town” (id. at 7).
For reasons enunciated above, this analysis is simply inadequate. The Town Board is not being asked to “guarantee” affordable housing. It is being asked to do what the law requires, i.e., to provide a balanced and well-ordered plan for the community which adequately considers regional needs and requirements, and which does not “by its zoning ordinance, create obstacles to the production of a full array of housing [including] . . . affordable housing” (Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 95). This is not accomplished by abrogating control to others and limiting opportunities of right simply to residences of adult communities and mobile home parks. Although the Town Board may have held extensive hearings, on the record before this court it did not take a “hard look” at the involved affordable housing concerns and certainly did not make a “reasoned elaboration” of its determination to eliminate the only multifamily zoning district within town borders.
*883 D. Petitioners’ Individual Remedies
Petitioners ask the court to direct the Town to rezone their respective properties to RM-1, as well as to direct the Town to review, process and approve their applications under the prior laws. Respondents argue that the court’s powers are limited to remanding the matter to the Town for the enactment of a proper zoning scheme.
It is permissible for a court, under “special circumstances,” to direct the rezoning of certain property for multi-family use where that property is clearly well suited (see, e.g., Berenson v Town of New Castle, 67 AD2d 506, 524 [1979]). While it appears that the Scott’s Corners area has historically been viewed as suitable for multi-family zoning, under the particular circumstances of this case it is unclear to the court why such a directive would be necessary. By this order, the court has declared the recently enacted Comprehensive Plan and Local Law Nos. 4 and 5 to be unconstitutional and, accordingly, void. By operation of law, the existing laws under which petitioners’ properties were zoned within the RM-1, RA-2 and RA-3 districts remain in effect. As this effectively moots all municipal actions regarding petitioners’ noncompliance with the Comprehensive Plan and Local Law Nos. 4 and 5, petitioners’ applications are reinstated and, as the moratorium has ended, the court expects all further proceedings regarding petitioners’ properties to move forward in good faith.
As respondents point out, the Town is not statutorily or otherwise legally required to adopt a comprehensive plan (see, Town Law § 272-a [1] [h]). The court will not, therefore, direct that the Town now adopt another comprehensive plan and zoning scheme. However, should the Town choose to do so, it must act in full compliance with SEQRA and the laws governing exclusionary zoning.
E. Preemption of Local Law No. 5
As Local Law No. 5 has been annulled on other grounds, petitioners’ preemption claims are moot and the court need not address the arguments raised in that regard.
E Attorneys’ Fees
Given the holdings regarding exclusionary zoning and SE-QRA, petitioners are entitled to an award of attorneys’ fees (see, Continental Bldg. Co. v Town of N. Salem, supra, 211 AD2d at 95; 42 USC § 1988). Accordingly, a hearing will be held as set forth above.
*884 Respondents’ Cross Motion
A. Federal Fair Housing and Equal Protection Claims
Respondents argue that none of the petitioners have established their standing as “aggrieved persons” entitled to assert the federal fair housing and equal protection claims set forth in the petitions. The court believes that respondents have, by their papers, established a prima facie case of entitlement to judgment in their favor in this regard. As petitioners’ papers raise no countervailing arguments, these causes of action are dismissed.
B. The Moratorium
The court agrees with respondents that, on the present record, petitioners’ claims regarding the moratorium are now moot (see, Matter of Hearst Corp. v Clyne, 50 NY2d 707 [1980]). However, the court finds the successive continuation of this moratorium for a period of some 2xh years to be disturbing, and cautions that such measures may not be used “in bad faith [to delay] a landowner’s application” (Matter of Home Depot U.S.A. v Village of Rockville Ctr., 295 AD2d 426, 428 [2002]).
C. Due Process Claims
Respondents maintain that they complied with all of the procedural requirements of Town Law § 264, and that petitioners’ due process claims must be dismissed. As the court is not presently finding any bad faith denial of petitioners’ individual rights, and as petitioners fail to raise any arguments in response to the cross motion, these claims are dismissed.
D. Takings Claims
Respondents argue that petitioners fail to proffer any evidence that they are unable to realize a reasonable return on their property, and accordingly fail to make a prima facie case in support of their takings claims. As petitioners raise no arguments in this regard, the claims are dismissed.
E. General Municipal Law § 239-m
As set forth above (n 5), petitioners do not establish that respondents failed to comply with the procedural requirements of General Municipal Law § 239-m.
F. General Municipal Law § 51
Respondents argue that petitioners fail to proffer prima facie evidence that an official conduct was illegal and fraudulent, collusive or motivated by personal gain (see, e.g., Clowes v Pulver, 258 AD2d 50, 56 [1999], lv dismissed 94 NY2d 858 [1999]), and the court agrees. Despite vague references to the typical *885 hyperbole common in local elections, petitioners make no evidentiary showing that they were singled out or that respondents’ actions fell outside of their official roles.

. Land Master sought a waiver from this moratorium, which was denied on or about November 18, 2004.

. As petitioners argue, such provisions subtly discourage affordable housing by increasing the acreage required to build in residential districts (Continental Bldg. Co. v Town of N. Salem, 211 AD2d 88, 93 [1995]).

. By short form order dated March 6, 2006, the court dismissed this cause of action as against former respondents Matthew D. Rudikoff Associates, Inc. and William Agresta, the Town’s consultants.

. In an exercise of true lawyer-like logic, the Town argues that while it should be commended for establishing the Affordable Housing Committee, to actually consider its findings would be to engage in “revisionist history” (reply affirmation of Paul Edward Svensson, Esq., dated May 15, 2006, ¶ 16). The Town’s self-created inability to consider the AHC’s findings was due to the fact that the committee was not established until on or about November 3, 2004, several months after adoption of the Comprehensive Plan and Local Law No. 4. Certainly this report is probative of the actual affordable housing needs within the town and the present exclusionary effects of the current laws.

. It does not appear from the record that respondents facially failed to comply with the procedural statutory requirements of General Municipal Law § 239-m, as a report of final action was filed even though it ran contrary to the recommendation (see, General Municipal Law § 239-m [6]). There is no claim, for instance, that the county did not have the final versions of the Comprehensive Plan or local laws for the requisite time period (see, General Municipal Law § 239-m [4] [b]; Matter of LCS Realty Co. v Incorporated Vil. of Roslyn, 273 AD2d 474 [2000], lv denied 96 NY2d 705 [2001]). However, for reasons stated herein, the court finds respondents’ answers to the county’s concerns to be dissatisfactory.

. Even an “Expanded Full EAF,” such as the one prepared by the Town Board in this case, “cannot ‘legitimately serve as a substitute for an EIS and the attendant analysis and public discussion entailed in a proper SEQRA review’ ” (Matter of S.P.A.C.E. v Hurley, 291 AD2d 563, 565 [2002], quoting Matter of West Branch Conservation Assn. v Planning Bd. of Town of Clarkstown, 207 AD2d 837, 840 [1994]).